# EXHIBIT A

1  Wesley M. Griffith (SBN 286390)
   **ALMEIDA LAW GROUP LLC**
2  3550 Watt Avenue, Suite 140
   Sacramento, CA 95608
3  Telephone: (530) 490-3178
   Email: wes@almeidalawgroup.com
4
5  David S. Almeida*
   **ALMEIDA LAW GROUP LLC**
6  849 W. Webster Avenue
   Chicago, Illinois 60614
7  Telephone (708) 437-6476
   Email: david@almeidalawgroup.com
8
   *Pro Hac Vice Application Forthcoming*
9
10 *Attorneys for Plaintiff and Putative Class*
11
12              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
13                       **COUNTY OF SAN DIEGO**
14

| | |
|---|---|
| **JULIE JONES,** *individually on behalf of herself and all others similarly situated*, <br><br> Plaintiff, <br><br> **v.** <br><br> **SKULLCANDY, INC.** <br><br> Defendant. | Case No. <br><br> **CLASS ACTION COMPLAINT FOR:** <br> 1. **VIOLATION OF CALIFORNIA INVASION OF PRIVACY ACT, CAL. PENAL CODE § 631;** <br><br> 2. **VIOLATION OF CALIFORNIA INVASION OF PRIVACY ACT, CAL PENAL CODE § 632** <br><br> 3. **UNJUST ENRICHMENT** <br><br> **DEMAND FOR JURY TRIAL** |

15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiff Julie Jones ("Plaintiff"), through her attorneys, individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant Skullcandy, Inc. ("Skullcandy" or "Defendant"), and its present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiff alleges the following on information and belief—except as to her own actions, counsel's investigations, and facts of public record.

## NATURE OF ACTION

1.      This is a class action lawsuit brought on behalf of all California residents with Facebook or Google accounts who accessed and navigated to https://www.skullcandy.com and its subpages (the "Website") while in California and whose communications and personally identifiable information ("PII") were intercepted by the Website.

2.      Skullcandy is an e-commerce platform offering a variety of headphones and audio equipment for sale online. Defendant is one of the world's largest sellers of personal audio equipment.

3.      On Defendant's Website, customers can purchase products directly or they can create an account, choose a password, and sign up directly for mailing lists and email notifications.

4.      In setting up its Website, Defendant chose to install certain invisible code including the Meta Pixel, Google DoubleClick and Google Analytics (the "Tracking Technologies"), which capture users' PII and communications with the Website and transmit this data to Meta Platforms, Inc. ("Meta" or "Facebook") and Alphabet, Inc. ("Google").

5.      In essence, Defendant's Tracking Technologies allow third parties like Google and Facebook to secretly monitor browsing activity of unsuspecting customers who use Defendant's Website to review and purchase Skullcandy products.

6.      In installing these invisible trackers, Defendant chose to allow third parties including Facebook and Google to identify specific users and monitor every step of their activity on the Website including which pages and products they view, which products they add to their carts and what they purchase.

7.     Defendant therefore aids, agrees with, employs, or otherwise enables third parties, notably Meta and Google, to eavesdrop on communications sent and received by users who visit the Website, including communications that contain sensitive and confidential information about their online activities and interests.

8.     By failing to obtain consent before enabling Meta and Google to intercept these communications, Defendant violated the California Invasion of Privacy Act ("CIPA"), California Penal Code §§ 631-632. Defendant was also unjustly enriched by their unlawful actions.

## PARTIES

9.     Plaintiff Julie Jones is an individual over 18 years old who has resided at all relevant times and continues to reside in San Diego County, California.

10.     Defendant Skullcandy, Inc. is a Delaware corporation with its principal place of business at 6301 N. Landmark Drive in Park City, Utah 84098.

11.     Defendant Skullcandy Inc.'s Website is accessed by users throughout California and the United States. Defendant does considerable business through its Website in California.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action under Cal. Code Civ. Proc. § 410.10., and the amount in controversy exceeds the jurisdictional minimum of this Court.

13.     This Court has personal jurisdiction over Defendant because Defendant's online business was purposefully directed at California and California residents. *See Briskin v. Shopify*, 135 F.4th 739, 760 (9th Cir. 2025) (Jurisdiction extends to websites operators whose websites, even if national, receive significant traffic the forum state).

14.     Venue is proper in this Court because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this County, and because Plaintiff resides in this County.

CLASS ACTION COMPLAINT

## **FACTUAL BACKGROUND**

**I.   CALIFORNIA   PROTECTS   ITS   RESIDENTS'   PRIVACY   IN   ONLINE COMMUNICATIONS THROUGH CIPA.**

15.    The California Legislature enacted CIPA to protect certain privacy rights of California citizens.

16.    The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

17.    The California Supreme Court has repeatedly stated the "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call.*" *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

18.    Further, as the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas*, 38 Cal. 3d at 360-61 (emphasis added; internal citations omitted); *see also Smith v. LoanMe, Inc.*, 11 Cal. 5th 183, 200 (2021) (reaffirming *Ribas*).

19.    As part of CIPA, the California Legislature introduced § 631(a), which imposes liability and creates a private right of action for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192 (1978).

20.    Specifically, CIPA § 631(a) prohibits any person or entity from:

    i.    intentionally tap[ping], or mak[ing] any unauthorized connection … with any telegraph or telephone wire;

    ii.    willfully and without the consent of all parties to the communication … read[ing], or attempt[ing] to read, or to learn the contents or meaning of any … communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [California]"; or

    iii.    us[ing], or attempt[ing] to use … any information so obtained.

21.    CIPA § 631(a) also penalizes those who "aid[], agree[] with, employ[], or conspire[] with" or "permit[]" "any person" to conduct the aforementioned wiretapping.

22.    The California Legislature also enacted CIPA § 632(a), which prohibits any person or entity from "intentionally and without the consent of all parties to a confidential communication, us[ing] an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication."

23.    A "confidential communication" for the purposes of CIPA § 632 is "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto." Cal. Penal Code § 632(c)

24.    Individuals may bring an action against the violator of CIPA §§ 631 and 632 for $5,000 per violation. Cal. Penal Code § 637.2.

## II.    META AND GOOGLE, AS ENABLED BY DEFENDANT, WIRETAP CALIFORNIANS' COMMUNICATIONS IN VIOLATION OF THE CIPA.

### A. Overview of the Meta Pixel and Tracking Technologies

25.    Meta describes itself as a "real identity platform,"[1] meaning users are allowed only one account and must share "the name they go by in everyday life."[2]

---

[1] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021), https://www.wsj.com/articles/how-manyusers-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701.

[2] *META, COMMUNITY STANDARDS: ACCOUNT INTEGRITY AND AUTHENTIC IDENTITY*, https://transparency.meta.com/policies/community-standards/account-integrity-and-authenticidentity/.

26.     To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[3]

27.     As recently as 2021, Meta generated over $100 billion in annual revenue.[4] Roughly 97% of that came from selling advertising space.[5]

28.     To bolster its advertising business, Meta surveils user activity both on and off its site, including through a dataset called "Core Audiences" and "Custom Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements[6] and reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[7]

29.     With Custom Audiences, advertisers can target existing customers directly, and can also build "Lookalike Audiences," which "leverage[] information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities, capturing this data by manually uploading contact information for customers, or by utilizing Meta's "Business Tools."[8]

30.     Additionally, programs in the Meta's Business Tools suite allow advertisers to collect user data through websites, mobile applications, and servers, thereby enabling Meta to intercept and collect user activity on those platforms.

31.     The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, including that webpage's Universal Resource Locator ("URL") and

---

[3] *META, SIGN UP*, https://www.facebook.com/signup.

[4] *META, META REPORTS FOURTH QUARTER AND FULL YEAR 2021 RESULTS*, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and- Full-Year-2021-Results/default.aspx.

[5] *Id.*

[6] *META, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK*, https://www.facebook.com/business/news/Core-Audiences.

[7] *META, AD TARGETING, HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS*, https://www.facebook.com/business/ads/ad-targeting.

[8] *META, CREATE A CUSTOMER LIST CUSTOM AUDIENCE*, https://www.facebook.com/business/help/170456843145568; *FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE*, https://www.facebook.com/business/help/1474662202748341.

metadata.[9]

32.    However, Meta's Business Tools can also track other events. Meta offers a menu of "standard events" from which advertisers can choose, including what content a visitor views, adds to cart or purchases.[10] Advertisers can even create their own tracking parameters by building a "custom event."[11]

33.    One such Business Tool is the Meta Pixel. Meta offers this piece of code to advertisers, like Defendant, to integrate into their websites. The Meta Pixel "tracks the people and the types of actions they take."[12]

34.    According to Meta, the Pixel is tracking code that allows Defendant to measure the effectiveness of [its] advertising by understanding the actions [website visitors] take on [its] website."[13] Thus, by secretly recording and transmitting data to Meta—without the user's knowledge or consent—the Pixel acts much like a traditional wiretap controlled by Defendant.

35.    When a user accesses a website hosting the Meta Pixel, Meta's software surreptitiously directs the user's browser to simultaneously send a separate message to Meta's servers. This second, secret transmission contains the original GET request sent to the host website, along with additional data that the Pixel is configured to collect.[14]

36.    This    transmission    is    initiated    by    Meta    code    and    concurrent    with    the

---

[9]    *See    META,    META    PIXEL    GUIDE:    ADVANCED*, https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also META, BEST PRACTICES    FOR    FACEBOOK    PIXEL    SETUP*, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; *META, APP EVENTS API*, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[10]    *META,    SPECIFICATIONS    FOR    FACEBOOK    PIXEL    STANDARD    EVENTS*, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[11]    *META,    ABOUT    STANDARD    AND    CUSTOM    WEBSITE    EVENTS*, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also*

[12] *META, RETARGETING*, https://www.facebook.com/business/goals/retargeting.

[13]    *About Meta Pixel*, Meta Business Help Center, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[14] GET requests are one of the most common types of HTTP Requests. An HTTP Request is an electronic communication a website visitor sends from his device's browser to the website's server. In addition to specifying a particular URL (i.e., web address), GET requests can also send data to the host server embedded inside the URL, and can include cookies.

communications with the host website. Two sets of code are thus automatically run as part of the browser's attempt to load and a website: the website's own code and Meta's embedded code.

37.     An example illustrates the point. Take an individual who navigates to the Website and clicks on a button to browse Defendant's speakers. Once that button is clicked, the individual's browser sends a GET request to Defendant's server requesting that server to load the particular webpage.

38.     Because Defendant utilizes the Meta Pixel, Meta's embedded code written in JavaScript sends secret instructions back to the individual's browser, without alerting the individual that this is happening, to send information from the Website to Meta.

39.     In addition to the Meta Pixel, upon information and good faith belief Defendant also installed and implemented Facebook's Conversions Application Programming Interface ("CAPI") on its Website servers.[15]

40.     Because CAPI is located on the website owner's servers and is not a bug planted onto the website User's browser, it allows website owners like Defendant to circumvent any ad blockers or other denials of consent by the User that would prevent the Pixel from sending website users' data and communications to Facebook directly.

41.     CAPI links collected data points to a "to a dataset ID and [they] are processed like events sent using the Meta Pixel."[16]

42.     As with the Meta Pixel, the Conversions API intercepts these communications contemporaneously and surreptitiously.[17]

43.     Meta confirms, in its "Meta Business Tools Terms,"[18] that it has the capability to

---

[15]     CAPI "works with your Facebook pixel to help improve the performance and measurement of your Facebook ad campaigns." *See* https://www.fetchfunnel.com/how-to-implement-facebook-conversions-api-in-shopify/.

[16]     META, CONVERSIONS API, https://developers.facebook.com/docs/marketing-api/conversions-api.

[17]     META, CONVERSIONS API END-TO-END IMPLEMENTATION, https://developers.facebook.com/docs/marketing-api/conversions-api/guides/end-to-end-implementation#pick-your-integration-type ("send events in real time … via the Conversions API").

[18]     META, META BUSINESS TOOLS TERMS, https://m.facebook.com/legal/businesstech.

use information it collects for purposes other than recording it and conveying it to Defendant, including generating reports and monitoring consumer safety.

44.    The user's communications to the Website are transmitted to Meta together with cookies and other unique identifiers that Meta can use to match the communications to individuals who have a Facebook account, including the c_user ID cookie which contains the user's unique Facebook ID.

45.    Defendant has also chosen to implement Meta Pixel's "Advanced Matching" feature, which allows website owners to send hashed customer data including PII (such as email addresses, phone numbers, and names) directly to Meta through the Pixel's code when users take specific actions on the website, such as filling out a form with their personal information.

46.    With Advanced Matching enabled, the Meta Pixel can capture additional information entered by users on the host website and transmit it to Meta, allowing for more precise user identification across devices and sessions, even if users are not logged into Facebook at the time of their visit.

47.    By enabling Advanced Matching, Defendant has deliberately configured the Meta Pixel to collect and transmit additional personally identifiable information beyond what the standard Pixel implementation would capture, significantly increasing the invasiveness of its tracking.

48.    Through its Business Tools suite, Meta has the capability to use the information it wiretaps for purposes other than simply providing a recording to Defendant including but not limited to: its own contact information matching, measurement and analytics services, ad targeting, commercial and transactional messages, ad delivery improvement; feature and content personalization, and product improvement, provision, and security.

49.    Transmission of users' data and communications only occurs on webpages that contain the Pixel. Thus, Plaintiff's and Class Members' PII would not have been disclosed to Facebook but for Defendant's decision to install the Pixel on its Website.

**B. Overview of Google's Tracking Technology**

50.    Google LLC operates Google Analytics, a leading web analytics service that

website owners use to understand user behavior, measure traffic, and optimize site performance.

51.    Google encourages businesses and website owners to use Google Analytics to gather insights about user interactions, such as page views, session duration, and conversions, which can be leveraged for advertising and other marketing activities.

52.    Central to Google Analytics is a snippet of code that, once embedded, enables the tracking of website visitors' actions and the collection of related data ("Google tag").

53.    This code helps determine when users perform key actions, such as viewing a page, clicking a link, or making a purchase, so that site owners can accurately measure engagement and conversions.

54.    This data transmission does not occur unless the Google tag is deliberately installed on the webpage. Website owners set up and install Google Analytics, and control over which events are tracked and how data is configured in their Analytics settings.

55.    In addition to implementing standard Google Analytics tracking, Defendant has deliberately chosen to integrate Google's DoubleClick technology into its Website.

56.    Google's documentation describes DoubleClick as a technology that "helps advertisers use their own first party data and Google's identity graph to reach the right people at the right time."

57.    DoubleClick's documentation explicitly acknowledges that it creates "user segments" based on browsing behavior.

58.    Websites that install DoubleClick can correlate website activity with Google's vast repository of user data, including search history, YouTube viewing patterns, and activities on other websites that use Google's advertising technologies.

59.    When a user visits Skullcandy's Website, DoubleClick automatically assigns that user to specific advertising segments based on the products they view, creating a detailed profile of their audio equipment preferences and spending habits.

60.    In implementing DoubleClick, Defendant has effectively authorized Google to maintain persistent surveillance of Website visitors' activities and connect those activities to Google's vast repository of user data.

CLASS ACTION COMPLAINT

61. Therefore, any information transmitted from a web page to Google through the Google tracking technologies described above would be transmitted only if the site owner chose to implement and configure Google Analytics in such a manner.

62. Like with the Meta Pixel, the user's communications to the website are transmitted to Google together with cookies and other unique identifiers that Google can use to match the communications to individuals who use Google's services.

## III. DEFENDANT VIOLATED CIPA BY ALLOWING THIRD-PARTY TRACKING TECHNOLOGIES ON ITS WEBSITE TO INTERCEPT CUSTOMERS' COMMUNICATIONS WITHOUT THEIR CONSENT.

63. From the moment consumers enter the Website, Defendant allows trackers, including at least the Tracking Technologies to watch their navigation through the Website.

64. The Tracking Technologies record and transmit unique user IDs that are matched to individuals and are used to track individual browsing habits.

65. The Tracking Technologies also record what actions users take on Defendant's Website, including which pages they navigate to, what items they add to their checkout carts and what Skullcandy products they purchase.

### A. Defendant Enables Third Parties to Pair Event Data and User Communications with User IDs.

66. The Tracking Technologies, as used by Defendant, pair event data and intercepted communications with users' social media identities.

67. Event data transmitted to third parties includes the complete URL, thereby disclosing the exact pages that a customer visited and the order in which she visited them.

68. Other events disclosed include a customer adding items to her cart or making a purchase of a specific item.

### 1. Defendant's Use of the Meta Pixel Enables Meta to Pair Event Data and User Communications with User IDs.

69. When a visitor accesses the Website while logged into Facebook, Defendant

CLASS ACTION COMPLAINT

compels the visitor's browser to transmit an identifying "computer cookie" to Meta called "c_user."

70.    The c_user cookie contains a Facebook user's unencrypted Facebook ID. A Facebook ID allows anybody-not just Facebook-to identify the individual consumer. Specifically, if one types www.facebook.com/[FacebookID] into a web browser, it will load that individual's Facebook page.

71.    When accessing product pages, the Skullcandy Website is configured to have the user's browser send various cookies to facebook.com.

72.    The Meta Pixel also transmits an "fr" cookie which contains, at least, a browser identifier and encrypted Facebook ID. The fr cookie has a lifespan of 90 days.

73.    The title of every product on Skullcandy is reflected in the page's URL. Skullcandy's Tracking Technologies on its Website create a PageView event every time a consumer goes to the webpage. The PageView event automatically sends data to Meta and discloses the URL of the webpage, which includes the product's title.

74.    Defendant also chose to configure certain custom events which disclose even more user information when the customer proceeds to make a purchase.

75.    For example, if a consumer clicks on the wireless speaker titled Kilo from the Skullcandy store, chooses to add the product to their cart, and adds a protection plan to their purchase, the Meta Pixel discloses this information to Meta via several events, including by sharing the URL of the page (https://www.skullcandy.com/products/kilo-wireless-bluetooth-speaker?variant=42418749407289) and custom events set up by Defendant such as "AddToCart," "AddPaymentInfo" and "InitiateCheckout." See Figures 1-2 below for examples:



76.     When a visitor views a product on Skullcandy's Website while logged into Facebook, Defendant compels a visitor's browser to transmit his or her "c_user" id, see Figure 3 below:



77.     The Meta Pixel also transmits an "fr" cookie containing both a browser identifier and an encrypted version of the user's Facebook ID.

78.     Meta, at a minimum, uses both the c_user and the fr cookies it receives when a customer uses Defendant's Website, to identify specific users, see Figure 4 below:

| Name | | Value | Do... | Path | Expi... | Size | Htt... | Sec... | Sa... | Part... | Cro... | Prio... |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ar_debug | | 1 | .fac... | / | Ses... | 9 | ✓ | ✓ | None | | | Me... |
| c_user | | 61572999414046 | .fac... | / | 202... | 20 | | ✓ | None | | | Me... |
| datr | | r5ajZ7MnwnU1CTfYzd-LlD3X | .fac... | / | 202... | 28 | ✓ | ✓ | None | | | Me... |
| dpr | | 1 | .fac... | / | 202... | 4 | | ✓ | None | | | Me... |
| fr | | 14UZOSx4WBA0zsKIJ.AWWZ-2jv... | .fac... | / | 202... | 93 | ✓ | ✓ | None | | | Me... |
| sb | | r5ajZyZ31Ge7qGAR60l9tKu1 | .fac... | / | 202... | 26 | ✓ | ✓ | None | | | Me... |
| xs | | 35%3AObdZ3YOagfd-8A%3A2%... | .fac... | / | 202... | 96 | ✓ | ✓ | None | | | Me... |

79.     Through the Meta Pixel's code, these cookies combine the identifiers with the event data, allowing Meta to know, among other things, that a consumer has visited certain

13

CLASS ACTION COMPLAINT

subpages on the Website, added specific items to his or her cart or proceeded to purchase specific items.

80.    Defendant discloses these identifiers so Meta can match them with a corresponding Facebook profile and link it to a user's subsequent activity on Skullcandy. A user's purchase in conjunction with his or her c_user ID and transmits the paired data to Meta.

81.    By compelling a visitor's browser to disclose the c_user and fr cookies alongside event data, Defendant knowingly discloses information sufficiently permitting an ordinary person to identify a specific individual's browsing and purchase behavior.

82.    Defendant also tracks customer information by using Meta's Advanced Matching features, through which they track customer data such as email addresses, phone numbers, and other identifiers including location-during Website interactions, see Figure 5 below:



83.    Advanced Matching is an optional feature that collects hashed customer data, and

which allows Defendant to create comprehensive profiles of individual consumers.

84.     By leveraging this tool, Defendant is effectively authorizing Meta and its network of advertising partners, to access, analyze, and exploit consumer data for commercial purposes, a practice that circumvents both statutory and ethical obligations to protect personal information.

85.     This data, containing a user's identifiable information as well as their browsing and purchase history, is used by Meta to target users with specific advertisements based on personal information that was intercepted without the user's knowledge or consent.

86.     Ultimately, Defendant authorizes Meta to capture a wide variety of user data, including browsing data, purchase data, and personal data, to enrich Facebook and advertisers who use this valuable data to target consumers with advertisements. Visitors to the Website never agree to this deal and receive no benefit in exchange of this expropriation of their personal information.

**2. Defendant's Use of Google Analytics Enables Google to Pair Event Data and User Communications with User IDs.**

87.     Defendant integrates Google Analytics on its Website to monitor and record users'' actions from the moment they arrive. Whenever a user visits a Skullcandy webpage, Google Analytics places or updates the "cid" (Client ID) cookie on that user's device which consists of a unique string that allows Google to recognize the same individual upon subsequent visits.

88.     Each time a user navigates to a product page, Google Analytics automatically records the full URL, timestamps, and various event data-such as which product was viewed, how long the user stayed on the page, and whether the user added any items to the cart. In tandem, the cid is sent to Google's servers, effectively tying all of these interactions to a single, persistent user profile that persists until the cookie expires or is cleared.

89.     Because the cid is unique to each user, it functions as a de facto identifier, enabling Google to build detailed behavior profiles over time. Through additional data points (e.g., IP addresses or device fingerprints), the same cid may be further correlated with personal information or other Google services-yielding a comprehensive picture of user habits and

interests.

90.     Defendant's Website use of Google Analytics records user behavior.

91.     As installed on Defendant's Website, Google Analytics records both page events, including whether a user viewed a specific page, and the user's distinct ID, see Figure 6 below.



92.     Simultaneously, Defendant deploys DoubleClick to track users through a "first-party" web-based identifier, or token.

93.     Whereas traditional, "third party" cookies can be blocked by browser settings, first party trackers like DoubleClick bypass many consumer privacy controls.

94.     Defendant's implementation of DoubleClick is particularly invasive because it captures real time data during user sessions. For example, a user views a specific headphone model on the Website, the DoubleClick code immediately intercepts this communication and transmits both the product details and user identifier to Google's servers, all without the user's knowledge or affirmative consent.

95.     Although this token is served under the domain of the Website, it is recognized by Google's DoubleClick servers, which can match the token to advertising IDs that uniquely identify the user's browser or device.

96.     When the Website loads, DoubleClick's scripts collect and transmit real-time

information about the pages the user views, the items they interact with, and any potential purchase or checkout steps.

97.    As seen in Figure 7 below, the first-party token is updated alongside these events, transmitting both the user's browsing history and the user ID to Google's broader advertising ecosystem.

| Request URL: | https://googleads.g.doubleclick.net/pagead/viewthroughconversion/9 68690393/?random=1738863112445&cv=11&fst=1738863112445&b g=ffffff&guid=ON&async=1&gtm=45be5240v9177189704z89179374 591za201zb874954458&gcd=13l3l3l3l1l1&dma=0&tag_exp=1020678 08~102081485~102123608~102482432~102539968~102558064~1 02587590&u_w=1920&u_h=1080&url=https%3A%2F%2Fwww.skullc andy.com%2Fproducts%2Fcrusher-anc-2-sensory-bass-headphones -with-active-noise-canceling%3Fvariant%3D44235968512057&hn= www.googleadservices.com&frm=0&tiba=Crusher%20ANC%202%20 -%20Bass%20Headphones%20with%20Noise%20Canceling%20%7 C%20True%20Wireless%20%7C%20Bluetooth%205.2%20%7C%20B uilt-in%20Microphone&userId=8127824035897&ga_uid=G-JSKQRKK M1F.D6E1EC3F-441d-45BE-a55f-2b089941de96&npa=0&auid=11372 76276.1738774157&uaa=arm&uab=64&uafvl=Not%2520A(Brand%3B 8.0.0.0%7CChromium%3B132.0.6834.110%7CGoogle%2520Chrom e%3B132.0.6834.110&uamb=0&uam=&uap=macOS&uapv=15.0.0&ua w=0&fledge=1&data=ecomm_pagetype%3Dproduct&rfmt=3&fmt=4 |
|---|---|

98.    The cid cookie and DoubleClick token allow Google to recognize users across multiple sessions and pages on the Website and possibly beyond. Such data forms the basis for user-level profiling, targeted advertisements, and analytics-based insights into individual behavior.

99.    By implementing both the third-party Google Analytics script (which relies on the cid to persist user IDs) and the first-party DoubleClick token, Defendant enables Google to assemble granular records of each consumer's browsing path, personal interests, and purchasing proclivities.

100.    This extensive tracking of user-identifiable data occurs in real time and is automated through each user's browser interactions with the Website. In effect, every pageview or button click is tagged with a persistent ID, ensuring that Google can systematically link each action to a specific user profile.

101.    B.    Defendant Enables Third Parties to Pair Event Data and User

Communications with User IDs without Obtaining Users' Consent.

102. Skullcandy did not obtain the requisite consent from any of the named Plaintiff or from putative class members before allegedly intercepting or disclosing their communications, in violation of CIPA.

103. Whereas Skullcandy's Cookie Policy explains that cookies and similar technologies may be used to collect and share user data with third-party partners for analytics and advertising; however, it does not clearly inform users that such disclosures might occur in real time while users are communicating or interacting with the site, nor does it secure the users' knowing and voluntary agreement to any potential interception of communications.

104. Skullcandy's vague references to data-sharing with third parties are insufficient under CIPA, which requires that users must know of and agree to any interception or recording of their communications. Defendant did not obtain such consent in a distinct or conspicuous manner; rather, it buried these details within a multi-purpose privacy policy and cookie policy, and terms of use hyperlink (collectively, "Policies") that are not tailored to meet CIPA's standards for consent.

105. Moreover, Skullcandy fails to give users a clear and conspicuous opportunity to refuse or withdraw consent to such interception and sharing on a case-by-case basis, even though CIPA requires meaningful consent for each intercepted communication.

106. At no point does Skullcandy plainly inform Website visitors that their interactions on the Website may be intercepted and shared with third parties nor provide a straightforward mechanism to decline or revoke that sharing. Instead, Skullcandy provides only a general mention of data usage and opt-out procedures in its Policies, without a specific, easily accessible means to stop the interception or disclosure of personal information during web sessions."

107. Skullcandy's home screen, which a user would see upon entering its Website, includes a small, obscured link to a "Cookie Policy" at the bottom of the page.

108. Likewise, links to any of the Terms can only be found in small font at the very bottom of the Website.

109. As the screenshots below show, neither of these hyperlinks are reasonably

conspicuous because they are buried at the bottom of a large screen, in nondescript font. Skullcandy has done nothing to distinguish these subtle hyperlinks. See Figure 8 and Figure 9 below.





110.    As seen above, the link to the Terms is presented in a font "considerably smaller than the font used in the surrounding website elements" and is overshadowed by "comparatively larger font used in all of the surrounding text," thereby minimizing users' awareness of the Privacy Policy link.

111.    The primary visual focus on Defendant's Website, on the other hand, consists of large, colorful product images, which naturally draw users' attention away from the smaller, less prominent privacy disclosures.

112.    These high-resolution product photographs, along with the larger text used elsewhere, "naturally direct[] the user's attention everywhere else" but the policy links.

113.    Skullcandy further deemphasizes these links by failing to use common design cues-such as underlining or distinct coloration (e.g., blue)-to signify that the text is clickable.

114.    The Ninth Circuit has emphasized that "a web designer must do more than simply underscore the hyperlinked text to ensure that it is sufficiently 'set apart' from the surrounding text." Skullcandy's design choices fail to pass this standard and thus do not supply adequate notice or an opportunity to consent.

### *Representative Plaintiff Julie Jones' Experience*

115.    Plaintiff Julie Jones is and at all relevant times has been a resident of San Diego, California.

116.    Plaintiff has had an account with Facebook since approximately 2007, signing up with her real (legal) name and the email she later used to create an account with Skullcandy.

117.    Plaintiff has had an account with Google since approximately 2021.

118.    Because Plaintiff's profiles contain her legal name, Plaintiff can be personally identified with that information.

119.    On or around February 7, 2025, Plaintiff accessed the Website and purchased earbuds from Skullcandy.

120.    As part of her use of the Website, Plaintiff visited a number of Website pages including those for the product she ended up purchasing.

121.    During the process of that purchase, Defendant disclosed her communications and PII to Google and Meta.

122.    Each time Plaintiff visited one of the Website pages, Defendant disclosed her event data, including the URL of pages visited, to Google and Meta.

123.    Defendant also disclosed unique identifiers for Plaintiff including the c_user and

fr cookies to Meta, and her cid cookie to Google.

124.    By disclosing her event data and unique identifiers, Defendant disclosed Plaintiff's PII to Google and Meta.

125.    Plaintiff did not consent to the disclosure of her PII, in writing or otherwise, and Defendant did not attempt to obtain Plaintiff's consent in a form separate and distinct from other legal and financial obligations.

126.    Defendant did not provide Plaintiff with an opportunity to withdraw from the disclosure of her PII.

127.    Plaintiff was harmed by not having the ability to opt out of Defendant's data sharing scheme and lost control over her personal information as a result.

128.    Because Defendant never clearly and conspicuously notified her it was even sharing her data with unauthorized third parties, including at least, Google and Meta, she never even had reasonable notice that such data collection was even taking place, let alone what steps she could take to control it.

## CLASS ACTION ALLEGATIONS

129.    Plaintiff brings this class action under Code of Civil Procedure § 382, individually and on behalf of all members of the following Class (the "Class"):

> All California residents who have a Facebook or Google account and accessed and navigated the Website while in California whose PII was disclosed.

130.    Numerosity: The Class is composed of at least thousands of individuals, the joinder of which in one action would be impracticable. The disposition of their claims through this class action will benefit both the parties and the Court.

131.    Existence and Predominance of Common Questions of Fact and Law: There is a well-defined community of interest in the questions of law and fact involved affecting the members of the proposed Class. The questions of law and fact common to the proposed Class predominate over questions affecting only individual class members. Such questions include, but are not limited to, the following: whether Defendant violated CIPA §631 and §632 and whether Plaintiff and the proposed Class members are entitled to damages, reasonable attorneys' fees, pre-

judgment interest and costs of this suit.

132.    Typicality: The claims of the named Plaintiff are typical of the claims of the Class because the Plaintiff, like all other class members, visited the Website and had their confidential electronic communications intercepted and disclosed to Facebook.

133.    Adequacy: Plaintiff is an adequate representative of the Class because their interests do not conflict with the interests of the Class they seek to represent, and because they have retained competent counsel experienced in data privacy litigation.

134.    Superiority: The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the Class. Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments.

135.    The class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues. Finally, Defendant has acted or refused to act on grounds generally applicable to the entire Class, thereby making it appropriate for this Court to grant final injunctive relief and declaratory relief with respect to the Class as a whole.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT**
**Cal. Penal Code § 631**
***(On Behalf of Plaintiff and the Class)***

136.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

137.    Plaintiff brings this claim against Defendant individually and on behalf of the

Class.

138.    CIPA §631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978).

139.    Thus, to establish liability under CIPA §631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
> Or
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
> Or
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
> Or
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

140.    CIPA §631(a) is not limited to phone lines but also applies to "new technologies" such as computers, the Internet, and email. See *Matera v. Google Inc.,* 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

141.    Google's Analytics and Meta's Business Tools including, but not limited to, the Meta Pixel, CAPI, Google Analytics, and Google DoubleClick, are each a "machine, instrument, contrivance, or other manner" used to engage in the prohibited conduct at issue here. Cal. Penal Code §631.

142.    Google and Meta are both a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc*., 562 F. Supp. 3d 503, 520 (C.D.

Cal. 2021).

143.    Further, Google and Meta each had the capability to use the wiretapped information for their own purposes.

144.    Accordingly, Google and Meta were third parties to any communication between Plaintiff and Class Members, on the one hand, and Defendant, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

145.    At all relevant times, through their Tracking Technologies, Google and Meta willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, or learned the contents or meaning of electronic communications of Plaintiff and Class Members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

146.    At all relevant times, Google and Meta used or attempted to use the communications intercepted by their Pixels to promote and improve its advertising platform.

147.    At all relevant times, Defendant aided, agreed with, employed, permitted, or otherwise enabled Google and Meta to wiretap Plaintiff and Class Members using the Tracking Technologies and to accomplish the wrongful conduct at issue here.

148.    Plaintiff and Class Members did not provide their prior consent to Google, or Meta for their intentional access, interception, reading, learning, recording, collection, and usage of Plaintiff's and Class Members' electronic communications.

149.    Nor did Plaintiff and Class Members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling Meta's or Google's conduct.

150.    The wiretapping of Plaintiff and Class Members occurred in California, where Plaintiff and Class Members accessed the Website and where Google and Meta, enabled by Defendant, routed Plaintiff's and Class Members' electronic communications its servers.

151.    Pursuant to Cal. Penal Code §637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA §631(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA §631(a).

## SECOND CAUSE OF ACTION
### VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT
### Cal. Penal Code § 632
### (*On Behalf of Plaintiff and the Class*)

152.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

153.    Plaintiff brings this claim against Defendant individually and on behalf of the Class.

154.    CIPA §632(a) prohibits an entity from:

> intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio.

155.    Google Analytics and Meta's Business Tools, including but not limited to the Google Analytics, Google DoubleClick, and Meta Pixel, are "electronic amplifying or recording device[s]."

156.    At all relevant times, Defendant used Google's Analytics, and Meta's Business Tools to allow Google, and Meta to eavesdrop upon and record the confidential communications of Plaintiff and Class Members, on the one hand, and Defendant, on the other.

157.    When communicating with Defendant, Plaintiff and Class Members had an objectively reasonable expectation of privacy because Website users would not have expected that Defendant or anyone else was recording and disseminating their browsing history without users' knowledge or consent.

158.    Thus, Plaintiff and Class Members did not reasonably expect that anyone other than Defendant would be on the other end of the communication, and that other, third-party entities like Google, and Meta, would intentionally use an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiff and Class Members.

159.    Plaintiff and Class Members did not consent to any of Google's or Meta's actions.

Nor have Plaintiff or Class Members consented to Google's or Meta's intentional use of an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiff and Class Members.

160.    Pursuant to Cal. Penal Code §637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA §632(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA §632(a), reasonable attorneys' fees and costs, and all other relief available at law or equity.

### THIRD CAUSE OF ACTION
UNJUST ENRICHMENT
(*On Behalf of Plaintiff and the Class*)

161.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

162.    Plaintiff brings this claim against Defendant individually and on behalf of the Class.

163.    Through their use of Defendant's Website, Plaintiff and Class Members conferred substantial economic benefits upon Defendant by providing valuable personal data, behavioral information, and detailed consumer insights.

164.    The personal data and communications intercepted by Defendant through the Tracking Technologies constitute valuable economic assets that Defendant has monetized and continues to monetize for its commercial benefit.

165.    Defendant has received, retained, and benefited from Plaintiff's and Class Members' personal data, including but not limited to:

    a.   Detailed browsing histories and product preferences;

    b.   Shopping cart contents and purchase behavior;

    c.   Personally identifiable information including names, email addresses, and Facebook/Google account identifiers;

    d.   Real-time behavioral data showing consumer interests and purchasing patterns; and

    e.   Demographic and psychographic profiles that enable targeted marketing.

166.    Defendant has monetized this data by using it to enhance its advertising effectiveness, improve customer targeting, increase conversion rates, and command higher advertising revenues from its marketing partners.

CLASS ACTION COMPLAINT

167.  The data collected through Defendant's Tracking Technologies enables Defendant:

a.  Create detailed customer profiles for more effective marketing campaigns;

b.  Retarget customers with personalized advertisements;

c.  Optimize product placement and pricing strategies;

d.  Generate valuable insights that improve business operations and profitability; and

e.  Share data with advertising partners in exchange for enhanced marketing services.

168.  The fair market value of the personal data and behavioral information that Plaintiff and Class Members provided to Defendant is substantial, as evidenced by the multi-billion dollar data-broker industry and the significant investments that companies like Meta and Google make in Tracking Technologies.

169.  Defendant obtained these valuable benefits through deceptive and secretive means, without providing clear notice to users that their data would be intercepted, collected, and monetized in real-time.

170.  Plaintiff and Class Members provided these valuable benefits to Defendant without receiving any meaningful compensation, consideration, or equivalent value in return.

171.  While Defendant provided access to its Website, the exchange was not a fair or knowing transaction because:

a.  Users were not informed that their specific browsing data would be intercepted and transmitted to third parties;

b.  Users were not told that their data would be monetized for Defendant's commercial benefit;

c.  Users were given no opportunity to negotiate the terms of the data exchange or decline participation; and

d.  The value of the data collected far exceeds any benefit users received from Website access.

172.  Defendant's retention and monetization of Plaintiff's and Class Members' personal data under these circumstances is unjust and inequitable because:

a.  The data was obtained without informed consent;

b.  Users were unaware that their valuable personal information was being collected and monetized;

c.  Defendant failed to provide fair compensation for the substantial economic value it derived from users' data; and

d.  Defendant's conduct violated reasonable expectations of privacy and fair dealing.

173.  Defendant has been unjustly enriched at the expense of Plaintiff and Class Members, who have been correspondingly harmed by the unauthorized appropriation and

monetization of their valuable personal data.

174.    Defendant's unjust enrichment continues as it retains and continues to monetize the personal data it improperly obtained from Plaintiff and Class Members.

175.    It would be inequitable and unjust to permit Defendant to retain the benefits it has received from Plaintiff's and Class Members' personal data without providing fair compensation.

176.    Plaintiff and Class Members are entitled to restitution of the value of the benefits that Defendant unjustly received, including disgorgement of all profits Defendant derived from the use of their personal data.

177.    Plaintiff and Class Members seek restitution and disgorgement of all profits and benefits Defendant obtained through its unjust retention of their personal data.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Julie Jones seeks a judgment against Defendant Skullcandy, Inc., individually and on behalf of all others similarly situated, as follows:

A.  For an order certifying the putative Class, naming Plaintiff as the representative of the putative Class, and naming Plaintiff's attorneys as Class Counsel to represent the putative Class Members;

B.  For an order declaring that the Defendant's conduct violates the statutes referenced herein;

C.  For an order finding in favor of Plaintiff and the putative Class on all counts asserted herein;

D.  For statutory damages in amounts to be determined by the Court and/or jury;

E.  For prejudgment interest on all amounts awarded;

F.  For injunctive relief as pleaded or as the Court may deem proper; and

G.  For an order awarding Plaintiff and the putative Class their reasonable attorneys' fees and expenses and costs of suit.

H.  For restitution and disgorgement of all profits and benefits Defendant obtained through its unjust enrichment.

Respectfully submitted,
Dated: June 4, 2025

By: *Wesley M Griffith*

Wesley Griffith (SBN 286390)
ALMEIDA LAW GROUP LLC
3550 Watt Avenue, Suite 140
Sacramento, CA 95608
Telephone: (530) 490-3178
Email: wes@almeidalawgroup.com

David S. Almeida*
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
Telephone (708) 437-6476
Email: david@almeidalawgroup.com

*Pro hac vice application forthcoming*

*Attorneys for Plaintiff and Putative Class*

**DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial for all claims so triable.

By _Wesley M Griffith_

Wesley Griffith (SBN 286390)
**ALMEIDA LAW GROUP LLC**
3550 Watt Avenue, Suite 140
Sacramento, CA 95608
Telephone: (530) 490-3178
Email: wes@almeidalawgroup.com

David S. Almeida*
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
Telephone: (708) 437-6476
Email: david@almeidalawgroup.com

*Pro hac vice application forthcoming*

*Attorneys for Plaintiff and Putative Class*

CLASS ACTION COMPLAINT